*606 OPINION OF THE COURT
Edwin Margolis, J.
This action involves a claim by a prison inmate for personal injuries inflicted by another inmate and alleged to have been caused by the negligence of prison oflicials. Specifically, claimant alleges that the prison officials were negligent in failing to take reasonable precautions to guard against the likelihood that unprovoked assaults would be made by claimant’s assailant.
It is well settled that the State has a duty to exercise reasonable care to assure the safety of inmates in its institutions (Flaherty v State of New York, 296 NY 342) and, in the context of the instant case, to provide its inmates with "reasonable protection against foreseeable risks of attack by other prisoners” (Sebastiano v State of New York, 112 AD2d 562, 564; see also, Restatement [Second] of Torts § 320). The question of whether there has been a breach of this duty by failing to conform to the appropriate standard of conduct is largely one to be determined in accordance with the facts and circumstances of each particular case. (See generally, Annotation, Prison — Assault by Prisoner, 41 ALR3d 1021.)
To establish the standard of conduct against which the circumstances of each case are to be tested, a risk-benefit analysis may be fruitfully utilized. Such analysis involves "balancing the risk, in the light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect, and the expedience of the course pursued.” (Prosser and Keeton, Torts § 31, at 173 [5th ed].) Thus, negligence is a concept that is " 'relative to the need and the occasion,’ and conduct which would be proper under some circumstances becomes negligence under others.” (Id., citing Cardozo, Ch. J., in Matter of Babington v Yellow Taxi Corp., 250 NY 14, 18.)
Therefore, in order to determine whether the State’s actions with respect to claimant’s assailant, one Hector Miranda, constituted negligence, it is necessary to review the full facts and circumstances and the public policy involved. One clearly relevant factor in assessing the risk that Miranda posed to other inmates is his past prison record.
Prison records introduced into evidence at trial indicate that between 1972 and 1982, when claimant was injured, at least 34 disciplinary proceedings were commenced against *607 Miranda by New York State correction officials. Of those 34 proceedings, 9 arose from assaults against either other inmates or correction officers; some of these involved knife stabbings and some were unprovoked attacks on inmates with whom Miranda had no prior relationship. In July 1976, while he was a prisoner at Green Haven Correctional Facility, Miranda was convicted of the crime of assault in the first degree, a class C felony, for stabbing another inmate with a knife; he was sentenced to an additional 3- to 6-year term of imprisonment, to run consecutively with the sentence he was then serving. In May 1981, he was confined to a special housing unit (solitary confinement) for one year for an assault on a correction officer, and in July of that year, he was sentenced to an additional year in special housing for another assault on a correction officer.[1] On April 28, 1982, at the time he was completing his first year in special housing, Miranda was certified a mentally ill inmate and transferred from Green Haven Correctional Facility to Central New York Psychiatric Center, pursuant to section 402 of the Correction Law. On June 23, 1982, he was returned to Green Haven, again in accordance with section 402. On Miranda’s return from Central New York, Green Haven officials remitted the balance of his first one-year special housing sentence and his second full-year sentence to "time served” and returned him to the general prison population. Miranda’s conduct from that time until September 24, 1982, the date of the assault on claimant, was unexceptional; his prison records for that period indicate no disciplinary violations or other evidence of any behavioral problems.
The circumstances of the assault on claimant, which occurred at approximately 6:00 p.m. on the evening of September 24, 1982, are as follows. Claimant was in the prison yard assembling picture frames during the after-dinner recreational period. This was an approved hobby, and Hann had been issued a hammer, as was authorized, for the duration of the recreational period. He placed the hammer on the table before him for a moment, and in that moment Miranda walked up behind him, picked up the hammer, and hit claimant on the head with it several times. In the subsequent investigation, prison authorities determined that the attack *608 was completely unprovoked and that Hann and Miranda had not known each other prior to the incident. As a result of the assault, Hann suffered a laceration over the right front area of the scalp which required sutures at the prison infirmary. He was then taken to a local hospital and diagnosed as having a cerebral concussion. He was discharged on September 26, 1982 in good condition.
The central issue presented by this case is whether the State had a duty to segregate or otherwise isolate Miranda from the general prison population. The general criterion in New York was stated by Judge Fuld in Flaherty v State of New York, as follows: "The law is clear; it is only in its application that difficulty is encountered. The State — just as any other party (Court of Claims Act, § 8; L. 1939, ch. 860) — is responsible, in the operation and management of its schools, hospitals and other institutions, only for hazards reasonably to be foreseen, only for risks reasonably to be perceived. ” (296 NY 342, 346, supra [emphasis supplied].)
Defendant argues in its posttrial brief that there was no proof that, at the time of the subject assault, claimant’s assailant was unduly dangerous or any more dangerous than any other inmate at Green Haven Correctional Facility and that "[a]bsent a finding by this Court that the claimant’s assailant was unduly dangerous, it cannot be said that the assault upon the claimant was foreseeable.”
The primary argument in support of the claim is that in view of Miranda’s record of assaultive behavior over the past 10 years, prison officials were not justified in allowing him to be in the general population where, for example, tools such as hammers were routinely issued to inmates. Defendant counters this argument by relying on several cases where courts have found that a specific assault on one prisoner by another was not foreseeable and that there had been no lack of adequate supervision. (See, e.g., Dizak v State of New York, 124 AD2d 329; Mobley v State of New York, 1 AD2d 731; Denza v State of New York, Ct Cl, Sept. 15, 1986, Blinder, J.; Vicente v State of New York, Ct Cl, Sept. 16, 1985, Weisberg, J.; Bartolomeo v State of New York, Ct Cl, Jan. 19, 1984, McCabe, J.) None of these cases, however, involved an assailant whose institutional record disclosed as great a propensity toward violence as does Miranda’s.
Each case of this nature turns on its specific facts and the court’s determination of what was reasonable or not reason *609 able under the circumstances. If only the foreseeability of risk established by Miranda’s record prior to June 23, 1982 were to be considered, this court would have no difficulty whatsoever in holding that the State was negligent in failing to exercise reasonable care to protect the safety of claimant and others from foreseeable harm. (See, Scolavino v State of New York, 297 NY 460; Sebastiano v State of New York, 112 AD2d 562, supra.)
In this case, however, consideration must also be given to Miranda’s prior commitment to and discharge from Central New York Psychiatric Center. As previously stated, after approximately 10 years’ incarceration during which Miranda was the subject of 34 disciplinary proceedings (including 9 assault cases), he was transferred on April 28, 1982 to Central New York Psychiatric Center, pursuant to the provisions of section 402 of the Correction Law. Section 402, as its precursor statute (former § 383), contemplates that a prisoner will be committed to a psychiatric institution only if he is mentally ill and in need of treatment or special custodial care because of problems he presents to himself or other prisoners. (See, United States ex rel. Schuster v Herold, 410 F2d 1071, 1087 [2d Cir 1969].)
Subdivision (5) of section 402 provides, in pertinent part, that a mentally ill inmate "shall be received into such hospital and retained there until he is determined to be no longer in need of care and treatment by the director of such hospital”. On June 23, 1982 — approximately two months after Miranda’s admission — the clinical deputy director of the Central New York Psychiatric Center certified in writing that Miranda no longer required treatment in a mental hospital. Accordingly, the Superintendent of Green Haven Correctional Facility properly received Miranda back into that facility.
Relying on the certificate and the provisions of section 402, the Superintendent could reasonably have concluded that Miranda was no longer a danger to himself or any other person. Such a conclusion, based upon a medical certificate by the deputy director of a State psychiatric hospital and in conformity with the relevant statute, would be in full accord with the rehabilitative and social goals of both modern penology and psychiatry. This background must be given great weight in determining whether the action of the Superintendent in placing Miranda in the general population was reasonable or unreasonable. The balance required has been set forth as follows: "Against [the] probability, and gravity, of the risk,
*610 must be balanced in every case the utility of the type of conduct in question * * * [W]hen a person’s actions are deliberative, and are undertaken to promote a chosen goal, the negligence issue becomes more complex. Chief among the factors which must be considered is the social value of the interest which the actor is seeking to advance.” (Prosser and Keeton, op. cit., at 171.)
Assuming, arguendo, that the medical judgment implying that Miranda was no longer dangerous to himself or to others was erroneous, that error certainly cannot be attributed to officials of Green Haven Correctional Facility.2 On balance, the court is of the opinion that the hospitalization and subsequent discharge of Miranda provided reasonable cause for the Superintendent of Green Haven Correctional Facility and other involved correction officials to treat Miranda as being no more dangerous than any other inmate at Green Haven. Consequently, placement in the general prison population was not unreasonable.
Claimant also relies on the proposition that the State was negligent either in releasing Miranda from special housing (to transfer him to Central New York) prior to the expiration of his disciplinary sentence or in not returning him to special housing to complete his sentence when he came back from the psychiatric hospital. Clearly, the first allegation is meritless; if Miranda was determined to be in need of commitment to a psychiatric hospital and therefore appropriate for such transfer under section 402, it is quite illogical to argue that such commitment must await completion of his special housing sentence.
After Miranda was later discharged from Central New York, the decision whether to remit his sentence in special housing to time already served would appear to be a function of proper management and operation of the prison in furtherance of the modern goals of penology. Claimant’s posttrial memorandum relies on the case of Williams v State of New York (Ct Cl, Dec. 5, 1985, Murray, J.), in which the State was held to be negligent for not continuing an inmate’s sentence
2. It should be noted in this regard that claimant did not allege or seek to prove that there was any medical malpractice or negligence on the part of the State’s physicians at Central New York Psychiatric Center. Moreover, since the 1954 decision of St. George v State of New York (283 App Div 245, affd 308 NY 681), it has been uniformly held that the State is not liable for errors of professional medical judgment by qualified doctors employed by it in its psychiatric hospitals.
*611 in special housing upon his transfer from one correctional facility to another. The difference between that case and the case at bar is that in Williams there was no intervening period of commitment to and subsequent discharge from a psychiatric hospital together with a medical judgment that the inmate was no longer in need of hospital care and treatment.
It has been held by both Federal and State courts that complete isolation of all prisoners having assaultive tendencies is not only impractical but also contrary to principles of rehabilitation. Certain calculated risks must sometimes be taken, even though inmate security may be somewhat lessened as a result. (See, e.g., Fleishour v United States, 365 F2d 126 [7th Cir 1966], cert denied 385 US 987; Brown v State of New York, Ct Cl, Sept. 8, 1982, Murray, J.). In these circumstances — where the potentially assaultive inmate had received psychiatric treatment and been released as needing no further hospital treatment — the degree of risk involved in placing him in the general prison population has to be seen as acceptable and reasonable. In any event, the evaluation and determination of what weight should be accorded Miranda’s intervening treatment and release in relation to his previous disciplinary record is — in the absence of controlling statute or regulation— a discretionary function for which the State has not waived its sovereign immunity. (See, Tarter v State of New York, 68 NY2d 511.)
On the basis of the evidence presented in this case, the court cannot find that the State was negligent. Accordingly, the clerk of the court is directed to enter judgment for defendant.

. Miranda accomplished that assault while he was confined in special housing by removing his wooden leg, tying a sharp bit of metal to the end, and then jabbing this artifact through the cell bars as if it were a spear.